UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ROBERT THIBODEAUX                                    CIVIL ACTION

VERSUS                                                      NO. 07-3647

MICHAEL J. ASTRUE, COMMISSIONER            SECTION "R" (2)
OF SOCIAL SECURITY ADMINISTRATION

## FINDINGS AND RECOMMENDATION

Plaintiff, Robert Thibodeaux, seeks judicial review pursuant to Section 405(g) of the Social Security Act (the "Act") of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Act. 42 U.S.C. §§ 405(g), 423. This matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rule 73.2E(B).

Although ordered to file a memorandum of facts and law, Record Doc. No. 12, plaintiff filed a timely "Memorandum in Support of Plaintiff's Motion for Summary Judgment." Record Doc. No. 13. Although defendant was also ordered to file a memorandum of facts and law, Record Doc. No. 12, he filed a timely "Cross-Motion for Summary Judgment." Record Doc. No. 15.

I.    <u>PROCEDURAL HISTORY</u>

Thibodeaux filed an application for DIB on March 21, 2005, alleging an inability to work due to depression and sleeping problems since April 7, 2003.[1] (Tr. 46-48).  After his application was denied, plaintiff requested a hearing, which was held before an Administrative Law Judge ("ALJ") on September 26, 2006.  (Tr. 17).  Plaintiff amended his application to request a closed period of disability through May 5, 2005, because he had returned to work on July 8, 2005.  (Tr. 105, 249-50).  On October 24, 2006, the ALJ issued a decision denying plaintiff's application for DIB.  (Tr. 23-34).  After the Appeals Council denied review on May 15, 2007, the ALJ's decision became the final decision of the Commissioner for purposes of this court's review. (Tr. 5-8).

II.   <u>STATEMENT OF ISSUES ON APPEAL</u>

Plaintiff contends that the ALJ made the following errors:

A.    The ALJ failed to weigh properly the opinions of the plaintiff's treating therapist and psychiatrist.

B.    The ALJ failed to address Step 3 of the sequential evaluation and failed to consider Listing 12.04 of the Commissioner's Listing of Impairments.

C.    The ALJ re-defined the term "moderate" in a psychiatric context in a way that rendered the term equivalent to "mild" or "none."

---

[1]Although plaintiff initially alleged an onset date of August 1, 2002 (Tr. 99), he amended the date to April 7, 2003.  (Tr. 26, 249-50).

2

III.   <u>ALJ'S FINDINGS RELEVANT TO ISSUES ON APPEAL</u>

The ALJ made the following relevant findings:

1.   Plaintiff did not engage in substantial work activity after April 2, 2003.  He returned to work in July 2005.

2.   He has medically determinable "severe" impairments of major depressive disorder; possible bipolar disorder; a sleep disorder related to either the depressive disorder or restless leg syndrome; and a history of alcohol abuse, reportedly in remission, which do not meet or equal any listed impairments found at 20 CFR, Part 404, Subpart P, Appendix 1.

3.   Thibodeaux has pain and functional limitations resulting from the pain, but his complaints are not as severe as alleged and are not credible.

4.   He has no evidence of any exertional or other physical limitation and retains the residual functional capacity to perform a full range of all levels of work, pursuant to Rule 204.00 of the Medical-Vocational Guidelines, 20 CFR, Part 404, Subpart P, Appendix 2, restricting him to lifting and/or carrying no more than one hundred pounds occasionally and five pounds frequently; sitting, standing and/or walking without limitation in an eight-hour day; and no limitations on pushing or pulling other than those listed under lifting and carrying.

5.   Plaintiff has non-exertional limitations of a moderate limitation in his ability to understand, remember and carry out detailed instruction, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision, complete a normal work day and work week without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, respond appropriately to changes in the work setting, and set realistic goals or make plans independently of others.

6.      Thibodeaux was 52 years old on his alleged onset date, was 55 years old when he started working in July 2005 and is currently 56 years old, the latter defined as advanced age, with four or more years of college education and past relevant work as a computer analyst.

7.      Thibodeaux can perform his past relevant work.

(Tr. 32-33).

IV.    <u>ANALYSIS</u>

A.    <u>Standards of Review</u>

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  <u>Perez v. Barnhart</u>, 415 F.3d 457, 461 (5th Cir. 2005); <u>Waters v. Barnhart</u>, 276 F.3d 716, 716 (5th Cir. 2002); <u>Loza v. Apfel</u>, 219 F.3d 378, 390 (5th Cir. 2000).  Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Perez</u>, 415 F.3d at 461; <u>Loza</u>, 219 F.3d at 393.  This court may not "reweigh the evidence in the record, try the issues <u>de novo</u> or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision."  <u>Newton v. Apfel</u>, 209

4

F.3d 448, 452 (5th Cir. 2000).  The Commissioner, rather than the courts, must resolve conflicts in the evidence.  Id.

The ALJ is entitled to make any finding that is supported by substantial evidence, regardless whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence supports it.  Perez, 415 F.3d at 461.  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Id.; Newton, 209 F.3d at 452; Martinez v. Chater, 64 F.3d 172, 173 (5th Cir. 1995).

To be considered disabled and eligible for DIB, plaintiff must show that he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A).  The Commissioner has promulgated regulations that provide procedures for evaluating a claim and determining disability.  20 C.F.R. §§ 404.1501 to 404.1599 & appendices, §§ 416.901 to 416.998 (2007).  The regulations include a five-step evaluation process for determining whether an impairment prevents a person from engaging in any substantial gainful activity.  Id. §§ 404.1520, 416.920;

<u>Perez</u>, 415 F.3d at 461; <u>Waters</u>, 276 F.3d at 716; <u>Loza</u>, 219 F.3d at 393.[2]  The five-step inquiry terminates if the Commissioner finds at any step that the claimant is or is not disabled.  <u>Perez</u>, 415 F.3d at 461.

The claimant has the burden of proof under the first four parts of the inquiry.  If he successfully carries this burden, the burden shifts to the Commissioner to show that other substantial gainful employment is available in the national economy that the claimant is capable of performing.  When the Commissioner shows that the claimant is capable of engaging in alternative employment, the burden of proof shifts back to the claimant to rebut this finding.  <u>Id.</u>; <u>Newton</u>, 209 F.3d at 453.

---

[2]The five-step analysis requires consideration of the following:

First, if the claimant is currently engaged in substantial gainful employment, he or she is found not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).

Second, if it is determined that, although the claimant is not engaged in substantial employment, he or she has no severe mental or physical impairment which would limit the ability to perform basic work-related functions, the claimant is found not disabled.  <u>Id.</u> §§ 404.1520(c), 416.920(c).

Third, if an individual's impairment has lasted or can be expected to last for a continuous period of twelve months and is either included in a list of serious impairments in the regulations or is medically equivalent to a listed impairment, he or she is considered disabled without consideration of vocational evidence.  <u>Id.</u> §§ 404.1520(d), 416.920(d).

Fourth, if a determination of disabled or not disabled cannot be made by these steps and the claimant has a severe impairment, the claimant's residual functional capacity and its effect on the claimant's past relevant work are evaluated.  If the impairment does not prohibit the claimant from returning to his or her former employment, the claimant is not disabled.  <u>Id.</u> §§ 404.1520(e), 416.920(e).

Fifth, if it is determined that the claimant cannot return to his or her former employment, then the claimant's age, education, and work experience are considered to see whether he or she can meet the physical and mental demands of a significant number of jobs in the national economy.  If the claimant cannot meet the demands, he or she will be found disabled.  <u>Id.</u> §§ 404.1520(f)(1), 416.920(f)(1).  To assist the Commissioner at this stage, the regulations provide certain tables that reflect major functional and vocational patterns.  When the findings made with respect to a claimant's vocational factors and residual functional capacity coincide, the rules direct a determination of disabled or not disabled.  <u>Id.</u> § 404, Subpt. P, App. 2, §§ 200.00-204.00, 416.969 (2004) ("Medical-Vocational Guidelines").

The court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) his age, education, and work history."  Martinez, 64 F.3d at 174.

B.    Factual Background

Thibodeaux stated that he began having difficulties at work in 2003 because he was falling asleep on the job.  He testified that he tried walking around the building a few times to wake himself up but it did not work, so he began leaving work to sit in his car and take a nap in the morning and the afternoon, for about an hour at a time.  (Tr. 252-53).  He stated that he felt "glued to the chair" at times and could not even get up to go for a walk.  Eventually, he was caught sleeping on the job and was given a disciplinary write-up in March 2003.  He stated that he was later laid off from his job when his employer conducted a reduction in force.  (Tr. 253).

Thibodeaux conceded that his work performance at that time could have been better.  He stated that his ability to concentrate was very poor and he was only able to handle tasks that were laid out for him step-by-step.  (Tr. 253-54).  He testified that he had no motivation to complete a task that required any type of creative thinking because his self-esteem was low.  He testified that he had a history of alcoholism and was

7

hospitalized for detoxification in late January to early February 2003, but has not had a drink since then.

Plaintiff stated that he stopped working on April 7, 2003.  He said that he was in treatment with a therapist, William Bischoff, and a psychiatrist, Dr. Ken Woolworth,[3] at that time. (Tr. 254).  He testified that Dr. Woolworth managed his medication and that Bischoff, a licensed social worker, provided him with counseling and psychotherapy.  He said he saw Bischoff weekly for more than two years.  Thibodeaux testified that Bischoff addressed his symptoms, including sleep problems ranging from too much sleep or hyperinsomnia[4] to intermittent episodes of sleep.  (Tr. 255).

Plaintiff testified that he would get up in the morning after sleeping eight or more hours and then need to nap for a couple of hours in the morning.  He said he would get up for lunch and a few activities, fall asleep again toward the end of the day for a while and still sleep all night the next night.  (Tr. 255-56).  He stated that he was sleeping from 14 to 18 hours a day overall and that it was interfering with his every day functioning and concentration.  He said he sometimes fell asleep while waiting to speak to Bischoff, even

---

[3]Although the transcript says "Woolworth [phonetic]" (Tr. 254), plaintiff's treating psychiatrist was A. Kennison Roy, III, M.D.  (Tr. 238).

[4]"Hyperinsomnia" does not appear in the medical dictionary.  This word probably should be "hypersomnia," which is defined as "excessive sleeping or sleepiness, as in any of a group of sleep disorders with a variety of physical and psychogenic causes."  Dorland's Illustrated Medical Dictionary at 857 (29th ed. 2000) (hereinafter "Dorland's").

though he tried to be rested before going to his appointment.  Plaintiff testified that his sleep problems caused moodiness, uncertainty and lack of concentration.  He said he was unable to hold a thought in his head and would lose track of what he was thinking about in the middle of trying to explain something.  (Tr. 256).  He stated that his thoughts were scattered and he was unable to concentrate on one thing at a time, but would have several things in his head at once, with none of them coming to a conclusion.  (Tr. 256-57).

Thibodeaux stated that he was limited at work to handling tasks that were laid out in a cookbook fashion.  He said that his judgment was seriously impaired when handling things at home and that he needed help to get through some of the daily activities of life.  However, he testified that he was able to pay his bills on time and handle his own hygiene, but he thought that working was out of the question at that time.  (Tr. 257).

Plaintiff testified that he had to certify that he was willing to work, capable of working and actively looking for work in order to keep his unemployment benefits.  He said he understood that such a certification was inconsistent with applying for disability benefits.  (Tr. 257-58).  He stated that he had thought he was capable of working when he applied for unemployment compensation and he would have attempted to work, but he did not believe he would have been successful if he had tried.  Thibodeaux said he had been looking for work that would have paid enough for him to pay his bills.  He stated that he applied for jobs on the internet during that time, but he never received any

feedback from the companies he contacted and, in retrospect, he thinks that the tasks probably would have been too great for him to handle. He testified that he thought at the time that he would try to work and maybe the sleep problem would not interfere. He said he now believes that he could not have sustained any form of employment at the time. (Tr. 258).

Plaintiff testified that he began working for American Utility Services ("AUS") on July 11, 2005, locating buried cable TV lines. He stated that his last full day of work was August 28, 2005, the day before Hurricane Katrina hit New Orleans, but he was laid off in late September 2005 because of lack of work. He said he began working at Home Depot in November 2005, doing mostly manual labor in the lumber and building materials area and doing some estimating for customers. (Tr. 259). He testified that his pay at Home Depot is about one-third of what he had earned as a computer analyst. (Tr. 259-60). He said he has not returned to work as a computer analyst because of a scarcity of jobs and because he is afraid that the sedentary nature and inactivity of the work would cause his sleep problems to recur. He stated that, when he returned to work in July 2005, he needed a job and the medication that Dr. Roy had prescribed kept him alert and awake, although the "side effects were killing me."

Plaintiff testified that he has tried numerous medications for his condition, including Geodon,[5] which caused his improvement in 2005. (Tr. 260). He stated that he experienced improvement and a sense of well-being almost immediately after starting Geodon and was able to sleep through the night. (Tr. 260-61). He testified that he was unable to read because the words on a page made no sense, when he began taking Geodon. He stated that the initial beneficial effects of the medication wore off after three or four weeks and he began experiencing paranoia, claustrophobia and racing thoughts. (Tr. 261). He stated that he was unable to process things emotionally and intellectually and he became ineffective, lethargic and like a "zombie," although he was still able to sleep through the night and stay awake the next day. (Tr. 262). He testified that the side effects were awful and that his doctor cut back his dosage over time to the minimal amount. He said that the side effects diminished as the dosage went down. (Tr. 262-63).

Thibodeaux testified that he underwent four sleep studies to determine if he had sleep apnea or narcolepsy. He said the initial studies showed that he did not have sleep apnea but that narcolepsy was a possibility, and the last study showed that he had

---

[5]Geodon (generic name: ziprasidone hydrochloride) "is used to treat schizophrenia and the manic episodes of bipolar disorder. Researchers believe it works by opposing the action of serotonin and dopamine, two of the brain's major chemical messengers. Because of its potentially serious side effects, Geodon is typically prescribed only after other medications have proved inadequate." PDRhealth (Physicians' Desktop Reference), avail. at
http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Geo1590.html&contentName=
Geodon&contentId=257.

periodic restless leg syndrome.  (Tr. 263-64).  He testified that he was prescribed Mirapex,[6] which he said should have given him immediate relief, but it gave him no relief at all.  He stated that the ultimate conclusion about his condition remains unknown.

Plaintiff testified that his typical day between April 7, 2003 and May 5, 2005 consisted of a full night's sleep, getting up between 6:00 and 7:30 a.m.  He said he would eat breakfast, go back to sleep around 8:30 or 9:00 a.m. and sleep until about noon.  (Tr. 264).  He stated that he would do various things from noon to around 2:30 p.m.  (Tr. 264-65).  He said he would fall asleep again around 2:30 p.m., until 5:00 or 6:00 p.m. Thibodeaux testified that he would do a few things around the house in the evening, but that he consistently never felt rested.  He recalled waking up during the day and feeling so groggy that he could barely move, despite having slept the whole night.  He testified that he slept from 14 to 18 hours a day.

Plaintiff stated that he had no social life between April 2003 and May 2005.  He testified that the only thing he did was go to Alcoholics Anonymous meetings at noon

---

[6]Mirapex (generic name: pramipexole dihydrochloride) "is not a cure, but eases the symptoms of Parkinson's disease—a progressive disorder marked by muscle rigidity, weakness, shaking, tremor, and eventually difficulty with walking and talking.  Parkinson's disease results from a shortage of the chemical messenger dopamine in certain areas of the brain. Mirapex is believed to work by boosting the action of whatever dopamine is available." Id. at
http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Mir1271.html&contentName=Mirapex&contentId=358.

and that he would sometimes fall asleep during the meetings.  (Tr. 265).  He said that

driving a car was somewhat difficult at times.  He stated that the only other social contact

he had was visiting with his daughters occasionally for very short periods of time.  He

said that he would not have been able to perform his prior job or any desk job during that

time because he would have fallen asleep.  Plaintiff testified that he would have been a

danger to himself and others if he had been doing the job that he has now, and that once

he even fell asleep while standing up.  (Tr. 266).  He stated that he was depressed and

suffered from lack of motivation, lethargy and reduced interest in taking care of himself

during those two years.  He said he had been given medications for depression, but they

did not work.  He stated that this was the only time in his life when he had been unable

to work since he started working at age 13.

Plaintiff testified that his primary care physician had prescribed an antidepressant,

Effexor,[7] but that it did not help him with either his sleep problem or his depression.

(Tr. 267).  He testified that Dr. Roy started him on Cymbalta,[8] which also did not work.

---

[7]Effexor (generic name:  venlafaxine hydrochloride) "is prescribed for the treatment of depression—that is, a continuing depression that interferes with daily functioning.  The symptoms usually include changes in appetite, sleep habits, and mind/body coordination, decreased sex drive, increased fatigue, feelings of guilt or worthlessness, difficulty concentrating, slowed thinking, and suicidal thoughts."  Id. at http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Eff1153.html&contentName=Effexor&contentId=198.

[8]Cymbalta (generic name: duloxetine hydrochloride) "is used to treat major depression—a disorder marked by continuing, serious, and overwhelming feelings of depression that interfere with daily

He said that he tried Seroquel,[9] which did not work, and that Dr. Roy next prescribed Geodon.  He said he now takes a minimal dosage of Geodon and a mood stabilizer, Lamictal,[10] which seem to be working fairly well.  (Tr. 268).

Thibodeaux confirmed that he told his doctor that he had a good response to Geodon in November 2004, as far as his sleep problem and mood were concerned, but he said he was surprised that Dr. Roy did not include more in his notes about the side effects, about which Thibodeaux said he complained regularly.  He stated that he meant the side effects of racing thoughts, followed by no thoughts at all.  He said Dr. Roy had

---

functioning."  Id. at http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Cym1693.html&contentName=Cymbalta&contentId=154.

[9]Seroquel (generic name:  quetiapine fumarate) is prescribed for the treatment of schizophrenia, a mental disorder marked by delusions (false beliefs), hallucinations, disrupted thinking, and loss of contact with reality.  It is also used for the treatment of manic and depressive episodes associated with bipolar disorder.  Seroquel belongs to one of the newer classes of antipsychotic medications.  Researchers believe that it works by diminishing the action of dopamine and serotonin, two of the brain's chief chemical messengers.
Id. at http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Ser1402.html&contentName=Seroquel&contentId=524.

[10]Lamictal (generic name:  lamotrigine) is prescribed to control seizures in people with epilepsy.  It is also used to control a serious form of epilepsy known as Lennox-Gastaut syndrome.  Lamictal is used in combination with other antiepileptic medications or as a replacement for a medication such as carbamazepine, phenytoin, phenobarbital, primidone, or valproate.  In addition, Lamictal is used to help prevent the manic and/or depressive phases of bipolar disorder.
Id. at http://www.pdrhealth.com/drugs/rx/rx-mono.aspx?contentFileName=Lam1217.html&contentName=Lamictal&contentId=294.

diagnosed him with bipolar disorder.  (Tr. 269).  As to Dr. Roy's note that plaintiff had said on March 24, 2005 that Geodon had "cured" his insomnia, plaintiff testified that Geodon had helped him sleep all night and stay awake during the day, but it had also produced the serious side effect of making him "a zombie," causing him to be unable to process thoughts and emotions and forget to do things that he usually handled, such as paying his bills.  (Tr. 269-70).

C.     Vocational Expert Testimony

A vocational expert, Richard Corbin, testified at the hearing.  He stated that plaintiff's previous job as a computer analyst was sedentary and skilled.  (Tr. 250).  The ALJ asked whether Thibodeaux could perform his prior relevant work with the moderate limitations found by the non-examining state agency consultant,[11] when "moderate is defined as limited but still able to function satisfactorily."  Corbin testified that Thibodeaux would have been able to perform his prior work under those circumstances. (Tr. 251, 270-71).

Upon cross-examination by plaintiff's attorney, Corbin testified that plaintiff's past relevant work would require the ability to sustain concentration for extended periods of

---

[11]The transcript says that these limitations were in Exhibit 12E, but there is no Exhibit 12E in the record.  However, Exhibit 12F is the Mental Residual Functional Capacity Assessment prepared by psychologist Yvonne H. Osborne, Ph.D., which contains the moderate limitations that the ALJ listed for the vocational expert.  (Tr. 222-23).

15

time.  He stated that such a job did not usually involve the ability to carry out detailed instructions, but that a computer analyst would be told to carry out a general directive and would usually accomplish the task on his own without being told at every step what to do.  Corbin stated that a computer analyst has to know a lot of details.  He testified that a moderate impairment in the ability to maintain attention and concentration for extended periods of time would cause some difficulty, but that the person possibly could continue to do the job.  (Tr. 271).

Plaintiff's attorney defined a marked impairment as any significant impairment that "would result in a frequent inability to complete the task at hand."  Corbin stated that a claimant with a marked impairment, as so defined, in his ability to maintain attention, concentration and persistence in pace probably would not be able to perform plaintiff's past relevant work.  Furthermore, assuming that plaintiff's testimony about his excessive sleeping and racing thoughts during the time period when his medications were being adjusted was credible, Corbin testified that such a claimant would not have been able to sustain full-time gainful employment.  (Tr. 271-72).

D.   Medical Evidence

I have reviewed the medical records in evidence and the ALJ's summary of the medical evidence.  (Tr. 28-32).  I find the ALJ's summary of the medical evidence

16

substantially correct and incorporate it herein by reference, with the modifications, corrections and highlights noted below.

      E.    <u>Plaintiff's Appeal</u>

          1.    <u>Whether the ALJ failed to weigh properly the opinions of the plaintiff's treating therapist and psychiatrist</u>.

Thibodeaux argues that the ALJ applied the incorrect legal standard because he failed to weigh properly the opinions of plaintiff's treating social worker therapist, Bischoff, and his treating psychiatrist, Dr. Roy.  These two sources essentially opined in letters dated April 20, 2005 and June 7, 2005, respectively, that plaintiff's psychiatric impairments precluded him from sustaining full-time gainful employment during the relevant time period for which plaintiff seeks DIB.  (Tr. 213-16, 238).  The ALJ rejected these conclusions, finding that the balance of the record evidence did not support them. (Tr. 31).  Citing <u>Newton v. Apfel</u>, 209 F.3d 448 (5th Cir. 2000), plaintiff argues that the ALJ was required to grant controlling weight to these treating source opinions and that, even if he did not grant them controlling weight, he should have specifically considered the several factors in 20 C.F.R. § 404.1527 before rejecting them.

Although the facts in the instant case present a much closer question than most of the disability determinations that this court reviews, substantial evidence supports the ALJ's findings in this regard.  The ALJ did not apply an incorrect legal standard.

17

It is well established that a treating source's statement that a patient is disabled does not mean that the patient is disabled for purposes of the Act, because that is a determination that may be made only by the Commissioner.  Frank v. Barnhart, 326 F.3d 618, 620 (5th Cir. 2003); Chambliss v. Massanari, 269 F.3d 520, 522 (5th Cir. 2001); Tamez v. Sullivan, 888 F.2d 334, 336 n.1 (5th Cir. 1989).  As the Fifth Circuit explained,

> some opinions by physicians are not medical opinions, and as such have no "special significance" in the ALJ's determination.  Among the opinions by treating doctors that have no special significance are determinations that an applicant is "disabled" or "unable to work."  These determinations are legal conclusions that the regulation describes as "reserved to the Commissioner." . . .  The doctor's opinion [that plaintiff could not work] was not a medical opinion within the meaning of the regulation.

Frank, 326 F.3d at 620 (quoting 20 C.F.R. § 404.1527(e), (1) & (e)(3)).  Thus, the ALJ was not required to accept, or to analyze in any detail, the opinions of Bischoff and Dr. Roy that plaintiff could not work.  Id.

In addition,

> [a] treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence.

> Even though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status.  [T]he ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion.  The treating physician's opinions are not conclusive. The opinions may be assigned little or no weight when good cause is

18

shown.  <u>Good cause may permit an ALJ to discount the weight of a treating</u>
<u>physician relative to other experts where the treating physician's evidence</u>
<u>is conclusory, is unsupported by medically acceptable clinical, laboratory,</u>
<u>or diagnostic techniques, or is otherwise unsupported by the evidence</u>.

<u>Newton</u>, 209 F.3d at 455-56 (quotations and citations omitted) (ellipsis in original)

(emphasis added).

The ALJ is <u>not</u> required to perform a detailed analysis of the treating physician's

views under the criteria in 20 C.F.R. § 404.1527(d)(2), <u>unless</u> there is <u>no</u> reliable medical

evidence from a treating or examining physician that controverts the claimant's treating

physicians.  <u>Id.</u> at 453.  In the instant case, the ALJ had good cause, based on substantial

evidence from treating or examining sources, to discount Bischoff's and Dr. Roy's

opinions.

First, Bischoff's April 20, 2005 letter was not supported by any notes of his long-

term treatment of plaintiff.  Thus, the letter was conclusory and unsupported by

medically acceptable clinical, laboratory or diagnostic techniques.

Second, the record contains contradictory evidence that provided good cause for

the ALJ to discount these two opinions.  Despite Dr. Roy's contention in his June 2005

letter that Thibodeaux was "psychiatrically disabled" and unable to sustain full-time

gainful employment from January 2003 through mid-2005, Dr. Roy's progress notes from

September 11, 2003 reflect that plaintiff's concentration and ambition were improving.

Dr. Roy recommended that Thibodeaux begin physical training and begin looking for work because he seemed able to return to the workplace. (Tr. 204). Over the next year, Dr. Roy consistently noted that plaintiff's mood was improved. He also noted that plaintiff was looking for work on the internet and had applied for jobs without success, but he still had not followed the doctor's recommendation to exercise and was "resistan[t] to personal industry." On November 10, 2004, plaintiff responded to Dr. Roy's inquiry about his condition with "a qualified 'good'" and said he had experienced a "handful" of brief episodes of "cognitive pause" within the past 60 days. By March 2005, plaintiff reported a "wonderful" response to Geodon, which had "cured" his insomnia and improved his mood. Dr. Roy's progress notes do not reflect the significant side effects about which plaintiff testified. (Tr. 200-04).

Other records from examining physicians also support the ALJ's conclusion. Thibodeaux was referred to a neurologist, Mossadiq S. Jaffri, M.D., on July 21, 2003 for evaluation of a possible sleep disorder. (Tr. 132-33). At a followup visit on August 18, 2003, plaintiff reported that his "overall . . . symptoms are significantly improved" with the adjustments in medications that Dr. Jaffri and Dr. Roy had prescribed. (Tr. 134). In a letter the same day, Dr. Jaffri stated that plaintiff's medications had "moderately improved his symptoms" and that he had a "mild to moderate impairment because of excessive sleepiness, which is getting better on his medications and should continue with

this.   I personally do not find him to be impaired to the extent where it justifies disability." (Tr. 135).

Plaintiff was examined by another neurologist, Bruce J. Fisch, M.D., who performed sleep studies in December 2003 that revealed very mild obstructive sleep apnea, restless leg syndrome and periodic limb movement disorder.  (Tr. 138, 141, 146, 159, 163).  At Dr. Fisch's initial evaluation on November 13, 3003, plaintiff reported that he had been taking Effexor since March 2003, which had helped his mood a lot and seemed to decrease his sleep episodes.  (Tr. 154).  He reported napping for 30 to 60 minutes in the morning and was refreshed and "can go all day."  His past history was negative for "sleep attacks," except for one incident in 1995 when he fell asleep while stopped at a traffic light at 10:00 p.m.  (Tr. 155).  Dr. Fisch's initial impression was "idiopathic hypersomnia–incapacitating" and depression.  (Tr. 158).  On December 23, 2003, Dr. Fisch discontinued the medication that Dr. Jaffri had prescribed because plaintiff said it was not helping and it was too expensive.  Dr. Fisch started Thibodeaux on Mirapex.  (Tr. 161, 163).  On March 4, 2004, plaintiff reported that the drug was beginning to work and helped him to sleep better.  He had no other complaints and he felt better.  (Tr. 165-69).

On May 24, 2004, Thibodeaux reported that he felt better since he had started exercising, although he now felt that Mirapex was helping only marginally.  Dr. Fisch's

impression was that plaintiff slept well and had decreased excessive daytime sleepiness, decreased restless leg syndrome and decreased weight when he exercised. Dr. Fisch recommended that Thibodeaux increase his daily exercise and continue taking Mirapex, but added that he might discontinue the drug if plaintiff's restless leg syndrome improved greatly with exercise. Dr. Fisch increased the interval for plaintiff's return visit from two or three months to five months. (Tr. 170-74).

Finally, plaintiff was evaluated by a consultative examiner, psychiatrist Gregory Paul, M.D., on June 7, 2005, just five weeks after the end of the alleged closed period of disability. Dr. Paul also reviewed Bischoff's letter dated April 20, 2005. Thibodeaux reported that he had been diagnosed with bipolar disorder and had chronic difficulty with sleeping, but stated that he had been sleeping well since taking Geodon. He did not report any side effects from the drug. On mental status examination, Dr. Paul observed that plaintiff's thought process, memory, attention and language abilities were intact. He found that plaintiff had no abnormalities and no psychiatric disorder that would impair him from functioning normally in a work environment. He also noted that plaintiff's history did not seem consistent with bipolar disorder. Dr. Paul diagnosed plaintiff with depression, not otherwise specified; history of alcohol dependence in remission for two

years; and dyssomnia,[12] not otherwise specified. (Tr. 217-21). Dr. Paul assigned a Global Assessment of Functioning Scale ("GAF") score of 70 (Tr. 221), which reflects that plaintiff had mild symptoms or "'some difficulty'" in social, occupational, or school functioning, but "'generally function[s] pretty well.'"  Sims v. Barnhart, 309 F.3d 424, 427 n.5 (7th Cir. 2002) (quoting American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 30, 32 (4th ed. 1994)).

Thus, the medical records from treating and examining sources contain evidence contradictory to the opinions of Bischoff and Dr. Roy, and the ALJ was not compelled to analyze the opinions in light of the factors in 20 C.F.R. § 404.1527(d)(2).  As he is required to do, the ALJ weighed the conflicting medical opinions and resolved the conflict against accepting the conclusory opinions of Bischoff and Dr. Roy.  Newton, 209 F.3d at 455-56; Martinez, 64 F.3d at 176.  The ALJ did not err by failing to assign controlling weight to these opinions.

----

[12]Dyssomnia is "a category of disorders consisting of disturbances in the quality, amount, or timing of sleep," including insomnia, hypersomnia, narcolepsy and breathing-related sleep disorder. Dorland's at 558.

    2.    <u>Whether the ALJ failed to address Step 3 of the sequential evaluation and failed to consider Listing 12.04 of the Commissioner's Listing of Impairments</u>.

Thibodeaux contends that the ALJ "skipped Step 3 of the sequential evaluation" and made no findings at Step 3.  Plaintiff's memorandum, Record Doc. No. 13, at pp. 10-11.  This is incorrect, as the ALJ plainly stated that "the claimant's impairments, although 'severe,' do not meet or equal any of the listed impairments described in the Listing of Impairments."  (Tr. 27).

To the extent plaintiff is arguing that the ALJ should have addressed specifically whether he satisfied the requirements of Listing 12.04 for affective disorder, the Fifth Circuit recently addressed a similar situation in <u>Audler v. Astrue</u>, 501 F.3d 446 (5th Cir. 2007).  In that case, as in the instant case, the plaintiff had claimed that she met a particular Listing and the ALJ had "summarily" stated at the third step that the plaintiff's severe impairments failed to meet or equal the requirements of any Listing.  <u>Id.</u> at 448. The ALJ in <u>Audler</u> had neither identified the listed impairment that she had considered nor explained how she had concluded that plaintiff's symptoms were not severe enough to meet any listed impairment.  The Fifth Circuit disapproved of this procedure. "Although the ALJ is not always required to do an exhaustive point-by-point discussion, in this case, the ALJ offered nothing to support her conclusion at this step and because

24

she did not, we, as a reviewing court, simply cannot tell whether her decision is based on substantial evidence or not."  Id. (quotation and citation omitted).

Having found that the ALJ had erred, the Fifth Circuit stated that "we must still determine whether this error was harmless.  Procedural perfection in administrative proceedings is not required as long as the substantial rights of a party have not been affected."  Id. (quotation and citations omitted).  Because Audler had submitted medical evidence showing that she "had most of the symptoms" of a particular listing, id. at 449, the Fifth Circuit held that the ALJ's error was not harmless.

> No medical evidence was introduced to contradict these findings.  Absent some explanation from the ALJ to the contrary, Audler would appear to have met her burden of demonstrating that she meets the Listing requirements for § 1.04A, and therefore her substantial rights were affected by the ALJ's failure to set out the bases for her decision at step three.

Id. (footnote omitted) (emphasis added).

By contrast, the ALJ's failure to discuss Listing 12.04 specifically in the instant case is a harmless error because substantial medical evidence contradicts plaintiff's contention that he meets the listing.  To satisfy Listing 12.04, Thibodeaux must show that he meets the requirements of both subparagraphs A and B.[13]  Even assuming that he met the clinical criteria of subparagraph A for depression or bipolar disorder, plaintiff must

---

[13]Plaintiff does not argue that he meets the requirements of subparagraph C, which is an alternative to meeting both subparagraphs A and B.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 (2007).

also meet the paragraph B requirements by showing that his disorder resulted in <u>at least</u> <u>two</u> of the following:

1.    Marked restriction of activities of daily living; or
2.    Marked difficulties in maintaining social functioning; or
3.    Marked difficulties in maintaining concentration, persistence, or pace; or
4.    Repeated episodes of decompensation, each of extended duration.

20 C.F.R. § 12.04(A).  "Marked" means "more than moderate, but less than extreme." <u>Id.</u> § 12.00(C).

The ALJ found that Thibodeaux did not suffer from <u>any</u> marked limitations in functioning.  These findings are supported by substantial evidence and were based on the appropriate legal standards, as described in the preceding section.  In addition to the evidence previously described, the ALJ relied on the findings of the non-examining state agency consultant, psychologist Yvonne H. Osborne, Ph.D., who completed a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique on June 27, 2005.  Dr. Osborne found that, although plaintiff exhibited several areas of moderate limitations, he had no marked limitations in any area.  (Tr. 222-37).

Accordingly, this assignment of error lacks merit.

3.     Whether the ALJ re-defined the term "moderate" in a psychiatric context in a way that rendered the term equivalent to "mild" or "none."

Finally, Thibodeaux argues that the ALJ erred by defining moderate, which is not defined in the Commissioner's regulations, for the vocational expert as "limited but still able to function satisfactorily." (Tr. 251).  Plaintiff argues that this definition improperly eviscerates the concept of "moderate" so that it equates to "mild" or "none."

The Fifth Circuit recently rejected a similar argument in Cantrell v. McMahon, 227 Fed. Appx. 321, 2007 WL 557567 (5th Cir. 2007).  In that case, the ALJ had "defined 'moderate', both in his decision and in the interrogatories directed to the vocational expert, as meaning 'there are some moderate limitations, but the person can still perform the task satisfactorily'."  Id. at *1.

> Cantrell claims that, because "moderate" falls between "mild" and "marked", which are defined in the regulations, it should indicate a greater degree of limitation than that in the ALJ's definition.  Although the term "moderate" is not defined in the regulations or the Program Operations Manual System, Cantrell does not show [that] the definition used by the ALJ conflicts with either.  "Marked" is defined as "more than moderate but less than extreme".  Accordingly, "moderate" is less severe and was not used in a manner inconsistent with the regulations.  Moreover, there is substantial evidence [that] the vocational expert understood the degree of limitation at issue in assessing what level of work a person with Cantrell's [residual functional capacity] could perform.

Id. at *2 (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(c)).

27

Similarly, in Beene v. McMahon, 226 Fed. Appx. 348, 2007 WL 836926 (5th Cir.

2007), when the ALJ used the same definition of moderate, the Fifth Circuit held that

> the critical issue on appeal is not the precise definition of "moderate" but whether the ALJ was properly able to assess Beene's [residual functional capacity] to determine:  whether she was able to perform her past job; or in the alternative, whether there were other jobs available for her in the national economy.  To that end, the ALJ had a vocational expert determine, based on the definition of the [residual functional capacity] found by the ALJ, whether Beene would be employable. . . .  The vocational expert was able to sufficiently incorporate the disabilities outlined by the ALJ and determine that Beene would be able to find employment in the national economy.

Id. at *2 (citations and internal quotation omitted).

In the instant case, Dr. Osborne's findings are presented on forms that allowed her

to check boxes for each area of functioning under the headings "Not Significantly

Limited," "Moderately Limited," "Markedly Limited" and "No Evidence of Limitation

in this Category" on the Mental Residual Functional Capacity Assessment, and the

headings of "None, Mild, Moderate, Marked" and "Extreme" on the Psychiatric Review

Technique, as well as to present a written narrative of plaintiff's limitations and

capabilities.  (Tr. 222-23, 234, 236).  Based on these findings, the ALJ plainly

understood that moderate meant more than none or mild.  The vocational expert also had

reviewed Dr. Osborne's findings and the rest of the medical records.  It appears that he

understood the basis for the ALJ's definition and was able to determine whether an

individual with moderate limitations could perform plaintiff's past relevant work. (Tr. 250-51, 271).

Accordingly, this assignment of error lacks merit.

CONCLUSION

The ALJ did not err by failing to accord controlling weight to the opinions of Bischoff and Dr. Roy, by failing to address the criteria of Listing 12.04 specifically or by defining "moderate" as he did.  Substantial evidence supports the ALJ's findings.

**RECOMMENDATION**

For the foregoing reasons, IT IS RECOMMENDED that plaintiff's complaint be DISMISSED WITH PREJUDICE.

A party's failure to file written objections to the proposed findings, conclusions, and recommendations in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with

notice that such consequences will result from a failure to object.  <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this __7th__ day of February, 2008.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

30